GLENN B. McCORMICK
Acting United States Attorney
District of Arizona
MARK J. WENKER
Arizona State Bar Number 018187
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
mark.wenker@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br>v.<br><br>21,880 Counterfeit 3M N95 Model 1860 and Model 1860S Masks,<br><br>    Defendants *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

### NATURE OF THE ACTION

1. This is a civil action *in rem*, brought to enforce the provisions of 19 U.S.C. § 1526(b) and (e) for forfeiture of merchandise imported into the United States that bears a trademark owned by citizen of, or by a corporation or association created or organized within, the United States without the written consent of the owner of the trademark, in violation of 19 U.S.C. § 1526(a).

2. This is a civil action *in rem*, brought to enforce the provisions of 19 U.S.C. §§ 1337 and 1526 for forfeiture of articles imported into the United States with a false or fraudulent trademark, in violation of 15 U.S.C. § 1124.

3. This is a civil action *in rem*, brought to enforce the provisions of 19 U.S.C. § 1337(i) for forfeiture of articles previously imported into the United States in violation of 19 U.S.C. § 1337(a).

## DEFENDANTS IN REM

4. 21,880 Counterfeit 3M N95 Model 1860 and Model 1860S Masks (collectively the "defendant property") seized on March 15, 2021 and remain in the custody of the Department of Homeland Security Investigations (HSI), Phoenix, Arizona.

## BACKGROUND

5. 3M Company (3M) is a provider of personal protective equipment (PPE), including respirators/masks, for healthcare professionals, industry workers, and the public. 3M has sold N95 respirators in the United States for decades.

6. Since the COVID-19 outbreak began, the public has become more familiar with 3M as a manufacturer of N95 respirators/masks and other PPE that are essential to protecting healthcare personnel and workers from exposure to airborne particles, including those that cause diseases like COVID-19.

7. In March 2021, HSI Phoenix, Arizona, Intellectual Property Rights (IPR)/Trade Fraud (CF)/Airport Group initiated an investigation into the sale and transfer of suspected counterfeit 3M N95 model 1860 and 1860S masks purchased by the Arizona Department of Administration (DOA), State Procurement Office.

8. In January 2021, Core X System LLC (Core X), a California company located in Hacienda Heights, California, sold the defendant property to the Arizona State Procurement Office (SPO).

9. When Core X negotiated the sale of the masks with SPO, Core X provided the SPO a copy of a TUV Rheinland (Greater China) Inspection Report. TUV Rheinland is a third-party company which ostensibly tests medical equipment to verify efficacy.

10. TUV Rheinland is not privy to safeguarded 3M trade secrets and manufacturing processes and is incapable of verifying the authenticity of trademarked 3M equipment or masks.

11. In early February 2021, SPO received the defendant property in their warehouse. SPO noticed that the packaging materials and the masks themselves appeared different than other 3M branded masks in their inventory.

12. Because of concerns about the authenticity of the defendant property, on February 18, 2021 the SPO contacted the 3M Covid-19 Fraud, Price Gouging and Counterfeit Product Response Team and provided several photos of the masks and their boxes, as well as details regarding the transaction.

13. On February 27, 2021, an SPO employee contacted a management representative with TUV Rheinland Greater China to corroborate the inspection report. On March 1, 2021, the TUV Rheinland management representative informed the SPO employee that the inspection report in question was not issued by TUV Rheinland.

14. On March 2, 2021, 3M Office of Intellectual Property Counsel confirmed the defendant 3M masks were counterfeit.

15. On March 15, 2021, HSI Special Agents responded to a State of Arizona warehouse located at 3949 W. Van Buren Road, Phoenix, Arizona where officers from DOA identified 21,880 3M N95 masks from the shipment received by Core X which they suspected to be counterfeit.

16. 3M owns numerous federal trademark registrations for its 3M Mark, including, among others, U.S. Reg. Nos. 3,398,329, 2,692,036, and 2,793,534.

17. HSI investigators examined and inventoried the masks and the associated packaging containing 3M trademarks. After receiving independent confirmation from 3M Fraud representatives that the masks were not authentic 3M product, HSI seized the defendant property.

18. On April 5, 2021 DHS issued a summons to Core X, directing the company to provide all records and communications related to the purchase, transfer, importation and sale of the defendant property, as well as any information regarding the origin of the faked TUV Rheinland inspection report.

19. On April 20, 2021, HSI SA Lazna received several documents from an attorney representing Core X.

3

20. The documents indicated Core X had purchased the masks from an Oklahoma company, Kairos Health Services (Kairos), and that the sale had been facilitated by a Pennsylvania company, Community Health Trilogy, Inc. (CHT).

21. Customs and Border Protection (CBP) entry records showed that a shipment, including the 22,000 counterfeit 3M masks, originated in Hong Kong, with a transshipment and final importation location of Singapore.

22. As of July 12, 2021, 3M's Fraud, Price Gouging and Counterfeit Product Response Team estimated that nearly 42 million counterfeit respirators had been seized domestically since the beginning of the global pandemic.

23. As counterfeit masks often use inferior materials and construction methods and do not properly fit the user, they represent a significant health risk to both medical professionals and the public at large.

24. Genuine 3M N95 masks contain advanced filter material and are designed to be tight fitting, forming a seal with the wearer's face, so inhaled air only passes through the filter instead of going around the edges of the mask.

25. Genuine 3M N95 masks contain proprietary, advanced electrostatic microfiber media to capture particles.

26. Counterfeit 3M masks can endanger the health and safety of the wearer and public as they do not have 3M's advanced filter material, are not designed to be tight fitting, do not contain 3M's proprietary, advanced electrostatic material, and are not tested by NIOSH.

27. Counterfeit masks are not designed, tested or approved to ensure they perform as advertised or expected.

28. 3M has issued periodic counterfeit alerts to combat this fraud. One such alert, published on February 11, 2021, noted, among other things:

    a. All 3M model 1860, 1860S, and 1870+ respirators imported into the United States from any other country are likely to be counterfeit.

    b. All 3M model 1860, 1860S, and 1870+ respirators exported from China/Hong Kong should be viewed as counterfeit.

      c.      No one should rely upon TUV, SGS or similar certification reports. All shipments of 3M model 1860, 1860S, and 1870+ respirators accompanied by a TUV, SGS, or similar certification report are likely counterfeit.

29.     Despite this alert, CoreX acquired the defendant property from overseas with a TUV certification and then sold the defendant property to the State of Arizona.

30.     On April 27, 2021, Kevin Rhodes, 3M Senior Vice President and Deputy General Counsel, presented written testimony to the Senate Subcommittee on Consumer Protection, Product Safety, and Data Security, in which he testified that:

> Genuine 3M N95 respirators contain advanced filter material and are designed to be tight fitting, forming a seal with the wearer's face, so inhaled air passes through the filter (instead of going around the edges). 3M N95 respirators contain proprietary, advanced electrostatic microfiber media to capture particles. 3M's unique manufacturing process injects an electrostatic charge into the microfibers, which are arranged in an open formation, allowing for easier passage of air while also enhancing the capture of airborne particles. 3M N95 respirators are also designed to seal to the wearer's face-as fit and seal are critical to respirator performance. 3M N95 respirators are tested on an ongoing basis to ensure they meet filtration efficiently requirements and other performance criteria specified in applicable government regulations. 3M has strict quality controls and manufacturing standards to help ensure the consistent high performance and consistent fit of our products.

31.     In late May of 2021, in response to DHS summons issued to Kairos and CHT, SA Lanza received emails from company officers for Kairos and CHT.

32.     The emails contained compressed files with documents that had been requested pursuant to two additional DHS summons issued to both these companies. Initial review of the documents indicated that Kairos purchased the counterfeit masks from a supplier in China.

33. Kairos used a customs brokerage company in Staten Island, NY – Global Trade Link, Inc. (GTL) – to facilitate the importation of the masks. CHT acted as a general broker/sales company, arranging the sale of the masks from Kairos to Core X.

34. Information in HSI databases indicated GTL, as well as one of its other client companies, CovCare, may be involved in the importation and/or sale of counterfeit 3M respirator masks in the United States.

35. Additionally, investigators believe CovCare may have initially provided the fake TUV Rheinland report to GTL and Kairos for the Arizona SPO shipment.

36. The government attempted to administratively forfeit the defendant property. After Core X filed a claim for defendant property, the claim was referred to the Phoenix office of the U.S. Attorney to initiate judicial proceedings.

37. On November 15, 2021, Philip Eitzman, a 3M Product Development Engineer who has worked at 3M since November 1991, opined as to the authenticity of the defendant property (the "Authenticity Report"). The Authenticity Report is attached as Exhibit A.

38. Mr. Eitzman has personal knowledge as a designer and developer of 3M's N95 respirators and he reviewed photographs and other records submitted to the 3M Fraud Hotline, as well as review of other records kept by 3M in the ordinary course of its business.

39. Mr. Eitzman has extensive training and experience identifying counterfeit 3M-brand N95 respirators and differentiating them from authentic 3M products.

40. Counterfeit products are determined to mean any products that did not originate from a 3M manufactured facility.

41. 3M received photographs of the defendant property and packaging delivered by Core X to the State of Arizona and determined that the defendant property is counterfeit.

42. Specifically, the printing on the defendant property did not conform to the known characteristics of printing present on authentic 3M 1860 and l860S masks and the

construction of the property did not conform to the known characteristics of authentic 3M 1860 and 1860S respirators.

### FIRST CLAIM FOR RELIEF

The defendant property is merchandise imported into the United States that bears a trademark owned by citizen of, or by a corporation or association created or organized within, the United States without the written consent of the owner of the trademark and therefore is subject to forfeiture pursuant to 19 U.S.C. § 1526(b) and (e).

### SECOND CLAIM FOR RELIEF

The defendant property represents articles imported into the United States with a false or fraudulent trademark and therefore is subject to forfeiture pursuant to 19 U.S.C. §§ 1337 and 1526.

### THIRD CLAIM FOR RELIEF

The defendant property represents articles previously imported into the United States in violation of law and therefore is subject to forfeiture d therefore is subject to forfeiture pursuant to 19 U.S.C. § 1337(i).

WHEREFORE, the United States of America prays that due notice be given to all parties, to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 22nd day of November 2021.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona


_____
MARK J. WENKER
Assistant United States Attorney